**Jeffrey J. Druckman**, OSB No. 792148
E-mail address: jeff@jjdlaw.com
**Janine C. Blatt**, OSB No. 922323
E-mail address: janine@jjdlaw.com
Druckman & Blatt, P.C.
0424 S.W. Iowa Street
Portland, Oregon 97239
Telephone: (503) 241-5033
Facsimile: (503) 241-9033

      Attorneys for Defendant

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

**JULIE FILAMORE-ANGEL**,

      Plaintiff,

    v.

**PROVIDENCE HEALTH & SERVICES - OREGON, d.b.a, PROVIDENCE ST. VINCENT MEDICAL CENTER,**

      Defendant.

Case No. 3:14-cv-01278-JE

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**ORAL ARGUMENT REQUESTED**

**MOTION**

      Defendant moves for summary judgment on all of plaintiff's claims. Pursuant to LR 7-1, this certifies that the parties made a good faith effort through telephone conference to resolve the dispute but were unable to do so.

**1 – Defendant's Motion for Summary Judgment**

This motion is based on the following Memorandum in Support of Motion, the declarations submitted herewith, and the record herein.

## MEMORANDUM IN SUPPORT OF MOTION

**I.    Introduction.**

This is an employment action. On April 4, 2014, plaintiff ("Filamore-Angel") resigned her employment as a Mental Health Associate ("MHA") at Providence St. Vincent Medical Center ("PSVMC"). She asserts claims for violations of ORS 659A.030(1)(f) and ORS 659A.199, alleging that defendant ("Providence") constructively discharged her because she participated as a witness in the administrative complaint filed by a former Providence nurse with the Oregon Bureau of Labor and Industries ("BOLI"). Her claims lack merit and should be dismissed.

**II.    Material Facts.**

**A.  Filamore-Angel's Job.**

On January 16, 2012, Providence Nurse Manager Inga Giske hired Filamore-Angel as an MHA, or certified nursing assistant, in PSVMC's adult mental health inpatient department ("Department"). Declaration of Inga Giske ("Giske Declaration"), ¶¶1-2. The Department serves adult patients who are in acute crisis because of psychiatric symptoms that render them unable to be maintained safely elsewhere in the community. Giske Declaration, ¶2. Filamore-Angel worked the night shift, three nights per week, under the supervision and direction of the charge nurse and registered nurses assigned to her shift. Giske Declaration, ¶3. Nurse Manager Giske worked days, Monday through Friday, and thus did not work directly with Filamore-Angel. Giske Declaration.

**2 – Defendant's Motion for Summary Judgment**

MHAs, under the direction and supervision of a registered nurse, observe and report on patient conditions and changes and collaborate with the patient's treatment team in developing treatment plans. MHA responsibilities include the following:

- Milieu management of patients under the guidance and supervision of a nurse;

- Monitoring of patient condition and activity, including one-to-one monitoring of assigned, high-risk patients;

- Timely and appropriate therapeutic support as deemed within the scope of practice for a MHA.

- Routine duties as assigned by a nurse. Giske Declaration, ¶4.

**B. Filamore-Angel immediately experiences conflict with some registered nurses.**

In 2012, Giske received reports from Filamore-Angel and other employees of conflict between Filamore-Angel and several nurses. Giske Declaration, ¶5 The conflicts seemed to occur when Filamore-Angel perceived that a nurse's behavior was demeaning toward her or someone else, particularly when delivering instructions or making assignments. Giske Declaration. The personality conflict between Filamore-Angel and one nurse, Laura Galbraith, became so significant that in the summer of 2012, Galbraith asked to be transferred to the day shift and Giske approved her request. Giske Declaration.

Giske also received reports from nurses that Filamore-Angel practiced outside the scope of her authority. For example, Filamore-Angel sent a nurse home. Staffing decisions are the responsibility of the charge nurse and MHAs – who work under the direction of a registered nurse – cannot send nurses home. Giske Declaration, ¶6.

**C. Filamore-Angel receives her first annual performance evaluation**.

On or around January 16, 2013, Giske gave Filamore-Angel her annual performance evaluation for 2012. Giske Declaration. Filamore-Angel received an overall rating

**3 – Defendant's Motion for Summary Judgment**

of "Meets Expectations" and a merit pay increase. Giske Declaration, ¶7 Giske made the following comments in the evaluation:

> "Julie works very hard to be a great team member. She is always willing to help her co-workers and patients. She truly cares for the poor and vulnerable and want[s] to help them on their journey to recovery. However, Julie's strong desire to help others and be an awesome team member sometimes causes her to do the wrong thing. Julie has a lot of knowledge in different areas and she is working to integrate that within her role and scope of practice as an MHA and CNA2. Julie is continuing to work on her communication with her team members and patients. She is understanding more how to utilize therapeutic communication in her interactions with patients. She attends in-services as required and works to consistently improve her knowledge and base skills." Giske Declaration, Exhibit 1.

### D.  BOLI interviews Filamore-Angel on March 21, 2013.

Sometime after January 29, 2013, Providence received notice that a former nurse, Edith Roberts, had filed a BOLI complaint ("Roberts Complaint"). Declaration of Andralene Allen. BOLI's investigation file, which Providence received after Filamore-Angel resigned, indicates that on March 21, 2013, Investigator Moayyad Khoshnaw interviewed plaintiff by telephone in connection with the Roberts Complaint. Declaration of Janine C. Blatt. Manager Giske did not know that a BOLI investigator had interviewed Filamore-Angel until November 2013, which is when BOLI sent notice to Providence that Filamore-Angel had filed a complaint alleging retaliation for her participation in the Roberts Complaint. Filamore-Angel did not tell Giske she had been interviewed on March 21, 2013, and Giske never spoke with Investigator Khoshnaw. Giske Declaration, ¶17. BOLI dismissed Filamore-Angel's complaint. Allen Declaration.

### E.  Filamore-Angel applies and is approved for intermittent family medical leave to care for an adult child.

On April 19, 2013, Filamore-Angel requested intermittent family medical leave ("FMLA") to care for an adult child with a health condition. Declaration of Grace Johnson ("Johnson Declaration"), ¶2. On May 17, 2013, Providence, through its third party leave

**4 – Defendant's Motion for Summary Judgment**

administrator, Sedgwick, approved the leave for the time period April 19, 2013 through October 18, 2013. Johnson Declaration, Exhibit 4.

   **F.  September 2013 – Filamore-Angel says she is owed wages and her FMLA leave is not being coded correctly.**

   PSVMC employees are required to accurately and completely record their own time by swiping their identification cards into Providence's ProvTime badge readers when they begin and stop working. Johnson Declaration, ¶4. This is referred to as "punching in" and "punching out." Providence's "Recording Time Worked" policy provides that employees

   "are responsible for confirming on a biweekly basis the accuracy of their time entered in [ProvTime], or that if their time is not accurately recorded, they have informed their supervisor in writing of any necessary corrections. **By submitting time, employees are agreeing that the information provided is accurate and that the hours submitted are all the hours the employee has worked that period."** Johnson Declaration, Exhibit 7 (emphasis in original).

   If an employee fails to swipe in or out, the employee can submit a written exception sheet to correct the error, but is expected to do so in the same payroll period. Johnson Declaration. If a manager approves the corrections on the exception sheet, the manager enters the corrections into ProvTime. ProvTime tracks all edits made by a manager. Johnson Declaration, ¶5.

   In summer 2013, the collective bargaining unit for PSVMC nurses alleged that some PSVMC managers – not Manager Giske – had changed their time entries without their approval for purposes of minimizing overtime. Johnson Declaration, ¶6. As an MHA, Filamore-Angel was not a member of the bargaining unit, but the issue was well publicized. Johnson Declaration. On September 16, 2013, Filamore-Angel sent an email to Patti Langdon, Senior Human Resource Strategic Partner, who forwarded it to Senior Human Resource Strategic Partner Grace Johnson. Johnson Declaration, ¶7. In the email, Filamore-Angel said she had audited her time records and believed Providence had failed to pay her for hours worked and

**5 – Defendant's Motion for Summary Judgment**

incorrectly edited her time on the following days  - *all but one of which is a date prior to her*

*March 21, 2013 BOLI interview*:

- **February 2, 2012**: A 12-hour shift for which she had not punched in or out, but had submitted an exception sheet.

- **November 28, 2012**: 15 minutes that her manager allegedly edited from her time card.

- **December 4-5, 2012**: A 16-hour, double shift.

- **January 25, 2013**: 75 additional minutes for a meeting with Giske that she attended after her shift.

- **March 4, 2013**: 45 minutes for a mandatory meeting.

- **March 8, 2013**: 30 minutes she alleged her manager edited off of her time.

- **April 19, 2013**: 4.5 hours for training that she said she had attended after her shift. Johnson Declaration, ¶7.

Filamore-Angel also said that her FMLA time was not being properly coded by her manager, causing incorrect application of her accrued paid leave. *Id.* Pursuant to Providence's policies, if an employee has accrued paid time off ("PTO"), or accrued extended illness time ("EIT"), such accrued leave is applied to cover a FMLA absence; otherwise FMLA leave is unpaid. Johnson Declaration, ¶ 3, Exhibits 5 & 6. Specifically, Filamore-Angel alleged mistakes on the following days:

- **April 19, 2013**: Her FMLA leave had been coded as PTO ILL 3 (paid time off, sick);

- **July 26, 2013**: PTO and EIT were applied to cover a FMLA leave, and only EIT should have been applied.

- **September 7, 12 & 13, 2013**: Her FMLA leaves were incorrectly coded as unpaid. Johnson Declaration, ¶7.

Human Resource Strategic Partner Johnson reviewed Filamore-Angel's pay records, ProvTime entries and the Department's work schedules to determine whether she had

**6 – Defendant's Motion for Summary Judgment**

been paid correctly. With respect to the dates Filamore-Angel said she had not been paid,

Johnson found as follows:

- **February 25, 2012; March 4, 2013**. Providence had paid Filamore-Angel for these hours.

- **December 4-5, 2012**: Filamore-Angel had not worked the 16 hours claimed. She was not listed on the work schedule for these days and had not punched in or out in ProvTime on either of these days.

- **March 8, 2013**: No manager edits had been made to the time Filamore-Angel had entered personally in ProvTime.

- **January 25, 2013**: Filamore-Angel had not punched in or out for this meeting with Giske. During the relevant payroll period, Giske had edited Filamore-Angel's time *to add* an additional hour of time for this meeting. It was Giske's recollection at the time she added the hour to Filamore-Angel's time that the meeting had lasted an hour; not the 135 minutes Filamore-Angel now claimed. Providence elected to give Filamore-Angel the benefit of the doubt and agreed to pay her an additional 75 minutes for the January 25 meeting.

- **November 28, 2012:** A discrepancy existed between Giske's recollection of the length of the meeting and Filamore-Angel's. Providence agreed to pay Filamore-Angel an additional 15 minutes of time.

- **April 19, 2013:** Providence did not find any evidence that Filamore-Angel had attended this training. Filamore-Angel had not punched in or out in ProvTime and had not signed any of the attendance sheets maintained by the instructor. Johnson Declaration, ¶8.

With respect to Filamore-Angel's claim that Giske was miscoding her FMLA

leave, Johnson reviewed Filamore-Angel's leave of absence pay history and determined that

Giske was not responsible for the alleged coding mistakes, most of which were not even

mistakes. Effective September 1, 2013, Sedgwick, the FMLA leave administrator, had stopped

sending payroll coding instructions to managers when notifying the manager of an employee's

FMLA leave of absence. When this change occurred, Providence's Nursing Payroll Services, not

Giske, became the entity responsible for determining 1) whether Filamore-Angel had accrued

paid leave available to cover an otherwise unpaid FMLA absence and 2) designating whether

**7 – Defendant's Motion for Summary Judgment**

PTO or EIT should be applied to the absence based on Providence's policies. Johnson
Declaration, ¶ 9. There sometimes was a short delay between the recording of the absence and
Sedgwick's communication to Nursing Payroll concerning approval of the leave. Johnson
Declaration.

After reviewing Filamore-Angel's leave and payroll history, Johnson found only
one day – September 7 – for which Filamore-Angel's accrued paid leave had not been applied to
a FMLA absence. Johnson asked Nursing Payroll to pay Filamore-Angel for this day from her
accrued PTO/EIT banks. Johnson Declaration, ¶10. Johnson also determined that Giske had not
erred in coding the absence on April 19, 2013. Giske had entered PTO ILL 3 in ProvTime on
April 19, 2013 rather than coding it as FMLA leave because at that time, this was the correct
code for the absence. Filamore-Angel had just submitted her request for FMLA leave that same
day and had not yet been approved for FMLA leave. Johnson Declaration, ¶11.

**G.  Filamore-Angel continues to have conflicts with nurses in 2013 and a work plan
is developed to help her improve.**

In late 2012, Merridee Dobbeck became the charge nurse for the night shift. On
several occasions in 2013, Dobbeck reported to Giske the following regarding Filamore-Angel:

- Filamore-Angel did not take direction well from Dobbeck and other nurses and would
  allege that she was being picked-on or harassed if she disagreed with the assignment
  or direction;

- Filamore-Angel practiced beyond her scope and made decisions about patients
  without first discussing the situation with the nurse responsible for the patient. Giske
  Declaration, ¶8.

Filamore-Angel also had conflicts with other nurses. For example, Giske received
the following reports:

- Filamore-Angel refused a nurse's instructions to take a post-procedure patient's vitals
  every fifteen minutes;

- Filamore-Angel threatened to privately sue a nurse;

**8 – Defendant's Motion for Summary Judgment**

- Filamore-Angel falsely accused staff of posting messages to Filamore-Angel's Facebook account using an assumed name; and

- Filamore-Angel accused a nurse of being Giske's "pet" because Filamore-Angel believed the nurse babysat for Giske's children, which was not true. Giske Declaration, ¶9.

On January 17, 2014, Johnson and Giske met with Filamore-Angel to address these issues and provide written notice to Filamore-Angel of Providence's expectations via a Work Plan for Improvement. Giske Declaration, ¶10, Exhibit 2. Work plans are development tools and are not formal discipline. Giske Declaration. The Work Plan, among other things, informed Filamore-Angel of the following expectations:

- Work within scope: Accept delegation from nurses. If a question arises, perform the patient care as long as it is safe and discuss with the nurse later.

- Teamwork: No further incidents with coworkers. If an issue arises, address it with the coworker using non-threatening language.

- Review and approve time card in a timely fashion: If a timecard is not correct, notify your manager immediately. If your pay is not correct, notify your manager in a timely fashion, i.e. within two weeks. Giske Declaration, Exhibit 2.

**H. Filamore-Angel applies for and receives a family medical leave of absence.**

On January 17, 2014, Filamore-Angel applied for a medical leave of absence. Johnson Declaration, ¶12. Providence approved the leave request. Filamore-Angel was released to return to work on February 25, 2014. Johnson Declaration, ¶12.

**I. Filamore-Angel returns to work and engages in unacceptable behavior.**

Upon return from leave, Filamore-Angel worked February 27, 2014, February 28, 2014, and March 1, 2014. Giske Declaration, ¶11. During the February 28, 2014 night shift, Giske received a telephone call at home from the charge nurse, Dobbeck, who said that Filamore-Angel had been telling others that Giske was going to fire her on her next shift, Saturday, March 1; this was causing a distraction on the unit. Giske Declaration, ¶11. Dobbeck also told Giske that Filamore-Angel had been assigned to monitor a patient who was a flight risk

9 – Defendant's Motion for Summary Judgment

and had proceeded to play cards with the patient very late into the night. It had become so late that Dobbeck had to intervene and remind Filamore-Angel that it was very late and the patient needed to rest. Dobbeck and Giske considered Filamore-Angel's interaction with this patient to be poor judgment because it is very important for psychiatric patients to get sufficient rest and maintain a regular schedule. Giske Declaration, ¶11.

Giske also received reports from two coworkers concerned about Filamore-Angel's behavior during her February 27 and 28 shifts. The coworkers told Giske that Filamore-Angel had badgered them about their jobs and kept asking them what they had heard about her while she had been on leave, making comments such as the following that they perceived as intimidating:

- Did you take the night position? This was said to an MHA who Filamore-Angel had accused of wanting to take Filamore-Angel's job/shift.

- Do you know anything going on that you should tell me?

- Don't worry; I am going to get fired soon.

- I know there is a lot of illegal stuff going on here. Giske Declaration, 12.¶

One of the coworkers also told Giske that on February 27, 2014, Filamore-Angel had commented to her in front of a psychiatric patient that, "We're having a party, where's the vodka." Giske Declaration, ¶12.

Following her Saturday, March 1 shift, Filamore-Angel called in absent on her next shift – March 6 – for FMLA reasons. Giske Declaration, ¶13. She next worked on March 7, 2014. At this time, Providence placed Filamore-Angel on a paid administrative leave of absence while it investigated what had occurred during the February shifts. Giske Declaration, ¶13. During this investigation, on March 10, 2014, Giske received a telephone call from Nurse Galbraith, who was the nurse with whom Filamore-Angel had conflicts in 2012. Giske Declaration, ¶13. Galbraith told Giske that she had received a Facebook message and then a

**10 – Defendant's Motion for Summary Judgment**

telephone call from Filamore-Angel. In the telephone call, Filamore-Angel made cryptic comments to Galbraith, who was pregnant, about something bad happening to her and her baby on the unit. Galbraith told Giske that she perceived from the telephone call that she and her baby were in danger physically from either Filamore-Angel or a patient in the unit. Giske Declaration, ¶13.

Providence's Code of Conduct includes expectations that employees will refrain from threatening behavior and contribute to a positive patient care and work environment. Johnson Declaration, ¶ 13, Exhibit 8. Giske, after consulting with Johnson, determined that Filamore-Angel's behavior warranted a documented verbal warning, which is first step of progressive discipline. Giske Declaration. Johnson and Giske scheduled a meeting with Filamore-Angel for March 13, 2014, to discuss her return to work. Giske Declaration, ¶14. Filamore-Angel did not appear for this meeting and Johnson and Giske, after speaking with Filamore-Angel by telephone, agreed to reschedule the meeting for March 21, 2014. Giske Declaration, ¶14.

On March 21, 2014, Johnson and Giske met with Filamore-Angel to give her the verbal warning and discuss expectations going forward. Giske Declaration, ¶15, Exhibit 3. The meeting concluded with Giske telling Filamore-Angel that Providence expected her to return to work on her next regularly scheduled shift on March 23, 2014. Giske Declaration, ¶15.

**J. Filamore-Angel goes out on FMLA leave and then submits her resignation.**

Filamore-Angel did not come to work on March 23, 2014 and instead reported her absence as FMLA leave. Giske Declaration, ¶16. She continued to take FMLA leave until April 4, 2014, when she submitted her resignation to Giske. Giske Declaration, ¶16. Providence processed Filamore-Angel's resignation effective April 9, 2014. Johnson Declaration, ¶16.

**11 – Defendant's Motion for Summary Judgment**

## II.    Legal Discussion.

Filamore-Angel bases both of the statutory wrongful discharge claims contained in her complaint on the same premise: that Providence discriminated against and constructively discharged her because she participated as a witness in the Roberts Complaint. Complaint ¶¶11-16, 22-23. Both claims lack merit and should be dismissed.

ORS 659A.030(1)(f) provides

"It is an unlawful employment practice:

\*\*\*

(f) For any person to discharge, expel or otherwise discriminate against any other person because that other person has opposed any unlawful practice, or because that other person has filed a complaint, testified or assisted in any proceeding under this chapter or has attempted to do so."

ORS659A.199(1) provides:

"It is an unlawful employment practice for an employer to discharge, demote, suspend or in any manner discriminate or retaliate against an employee ... for the reason that the employee has in good faith reported information that the employee believes is evidence of a violation of a state or federal law, rule or regulation."

To establish a prima facie case of retaliation under each statute, Filamore-Angel must show (1) she was engaging in an activity protected by the statute, (2) she suffered an adverse employment decision, and (3) there was a causal link between the protected activity and the adverse employment decision." *Sandberg v. City of N. Plains*, No. 10–CV–1273–HZ, 2012 WL 602434, at *7 (D.Or. Feb. 22, 2012) (quoting *Ruggles v. Cal. Polytechnic State Univ.*, 797 F.2d 782, 785 (9th Cir. 1986). Far from being able to prove all three elements, Filamore-Angel cannot establish 1) that the BOLI interview was protected activity under ORS 659A.199; 2) that her resignation was an adverse action; or 3) causation.

First, Filamore-Angel's claim under ORS 659A.199A fails because she cannot show that by participating in the BOLI interview she made a good faith report of information she believed was evidence of a legal violation. This claim should be dismissed because Filamore-

**12 – Defendant's Motion for Summary Judgment**

Angel was interviewed as a witness in the Roberts Complaint; she was not reporting information she believed was evidence of the violation of federal or state laws or regulations.

Moreover, both claims should be dismissed because Providence did not terminate Filamore-Angel. An employee cannot sustain a statutory wrongful discharge claim without first establishing a discharge. Because Filamore-Angel resigned her employment, she must establish that she was "constructively discharged" – that is, that the employer's "intentional conduct made [her] employment so intolerable that a reasonable person in plaintiff's position would have resigned." *McGanty v. Staudenraus*, 321 Or. 532, 557, 901 P.2d 841 (1995). This is a demanding test. The Oregon Supreme Court has adopted the following elements for a constructive discharge:

> "(1) the employer intentionally created or intentionally maintained specified working conditions; (2) those working conditions were so intolerable that a reasonable person in the employee's position would have resigned because of them; (3) the employer desired to cause the employee to leave employment as a result of those working conditions or knew that the employee was certain or substantially certain, to leave employment as a result of those working conditions; and (4) the employee did leave the employment as a result of those working conditions." *Id.* at 557 (footnotes omitted).

The second requirement – whether a reasonable person would have resigned - is patterned off the test adopted by federal courts and embodies an objective test, requiring that "an objective inquiry * * * be made to determine whether working conditions imposed by an employer are so intolerable as to force a resignation." *McGanty*, 321 Or. at 556; 901 P.2d at 856. This standard is difficult to satisfy. The facts must suggest "such an aggravated situation that a reasonable employee would be forced to resign." *Nolan v. Cleland*, 686 F.2d 806, 813 (9th Cir. 1982) (quoting *Bourque v. Powell Electrical Manufacturing Co*., 617 F.2d 61, 66 (5th Cir. 1980)); see also *Sheridan v. Providence Health & Services*, No. 10-cv-775-PK (Findings & Recommendation, Judge Papak, D. Or., September 6, 2011) (affirming summary judgment to

**13 – Defendant's Motion for Summary Judgment**

employer on plaintiff's claims alleging constructive discharge); *adopted by*, Opinion and Order of Judge Simon, D. Or., December 29, 2011.

Filamore-Angel alleges that she was forced to resign by: 1) excessive discipline; 2) miscoding of protected leave; 3) alteration of time card records, and 4) false reports to the Oregon State Board of Nursing. The facts do not support her allegations.

First, the only discipline Filamore-Angel received was a verbal warning. This is hardly excessive and courts have routinely held that performance management does not justify a resignation. See *Poland* v. *Chertoff*, 494 F.3d 1174, 1185 (9th Cir. 2007) (two adverse actions – a cross- country transfer and a demotion –were insufficient to support constructive discharge); *Kortan v. California Youth Authority*, 217 F.3d 1104, 1112 (9th Cir. 2000) (supervisor's negative evaluation and criticism of plaintiff's performance not sufficient to establish constructive discharge).

Second, disagreement over wages allegedly unpaid on sporadic dates between February 2012 and April 2013 is not an objectively reasonable basis for resigning more than a year after the date of the last alleged error. Likewise, a payroll mistake causing delay in the application of available accrued leave to cover one FMLA absence in September 2013 is not an objectively reasonable basis for resigning seven months later.[1] Legal recourse is available to any employee who believes he or she is not properly paid; that is the objectively reasonable course of action. Providence appropriately investigated and responded to Filamore-Angel's questions concerning her pay, resolving several discrepancies in her favor. Significantly, Filamore-Angel does not assert a wage claim in this action.

Third, Filamore-Angel will not be able to offer evidence that any Providence employee reported her, or made false allegations about her, to the Oregon Nursing Board during

---

[1] Filamore-Angel does not allege that Providence ever denied her FMLA leave. The mistake she complains about is a failure to deduct paid time from available PTO or EIT and apply it to the absence. There is no evidence that any error in application was intentional.

**14 – Defendant's Motion for Summary Judgment**

her employment. Because there is no evidence of such a report, it cannot have contributed to Filamore-Angel's decision to resign and therefore cannot be found to have forced Filamore-Angel to resign.

Even if Filamore-Angel established that she was constructively discharged and therefore suffered an adverse action, which she cannot, her claim fails because she cannot establish causation. It is not enough to show objectively intolerable working conditions; she must establish that such conditions were intentionally created because of her participation in the Roberts Complaint. See *Nkrumah v. City of Portland*, 261 Or. App. 365 (2014); see also *Estes v. Lewis and Clark College*, 152 Or.App. 372, 381, 954 P.2d 792 (1998); *Huff v. City of Portland*, No. 05–1831–AA, 2008 WL 1902760, at *6 (D. Or., Apr. 28, 2008) ("Plaintiff bears the burden of establishing that her alleged disclosures constituted 'a substantial factor' in the discontinuation of her employment."). This evidence is utterly lacking here. Significantly, all but one of the dates on which Filamore-Angel claimed pay for time worked are dates well *before* the BOLI interview. Moreover, Giske and Providence did not know that BOLI had interviewed Filamore-Angel at the time of the alleged September FMLA/paid time off coding mistakes. Lastly, Filamore-Angel cannot establish a causal link between the March 2013 interview and the verbal warning for her behavior that occurred in February and March 2014, a year later.

No reasonable juror can find in favor of Filamore-Angel on either of her

**15 – Defendant's Motion for Summary Judgment**

statutory claims. The court should grant summary judgment to Providence and dismiss Filamore-Angel's complaint.

Dated this 30th day of July, 2015.

s/Janine C. Blatt
Janine C. Blatt
OSB No. 922323
E-mail: janine@jjdlaw.com

Druckman & Blatt, P.C.
0424 SW Iowa Street
Portland, Oregon 97239
Telephone: (503) 241-5033
Fax: (503) 241-9033

Attorney for Defendant

**16 – Defendant's Motion for Summary Judgment**

I hereby certify that I served the foregoing **Defendant's Motion for Summary Judgment** on:

> Eric J. Fjelstad
> Smith & Fjelstad
> 722 N. Main Ave.
> Gresham, OR 97030
> 503-669-2242
>
> Attorney for Plaintiff

by the following indicated method or methods:

☐      by **mailing** a full, true, and correct copy thereof in a sealed, first-class postage-prepaid envelope, addressed to the attorney as shown above, the last-known office address of the attorney, and deposited with the United States Postal Service at Portland, Oregon, on the date set forth below.

☒      by **electronic filing** with the District Court's CM/ECF system.

☐      by sending a full, true, and correct copy thereof via **overnight courier** in a sealed, prepaid envelope, addressed to the attorney as shown above, the last-known office address of the attorney, on the date set forth below.

☐      by **faxing** a full, true, and correct copy thereof to the attorney at the fax number shown above, which is the last-known fax number for the attorney's office on the date set forth below.

Dated this 30th day of July 2015.

> s/Janine C. Blatt
> Janine Blatt,
> Druckman & Blatt, P.C.
> 0424 SW Iowa Street
> Portland, Oregon 97239
> Telephone: (503) 241-5033
> Fax: (503) 241-9033
> E-mail: janine@jjdlaw.com
>
> Attorney for Defendant

**1 – Certificate of Service**